NATIONAL PUBLIC RADIO,
INC., et al., Petitioners,

v.

FEDERAL COMMUNICATIONS COM-
MISSION and United States of
America, Respondents.

Cornerstone Community Radio,
Inc., et al., Intervenors.

Nos. 00–1246, 00–1255.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 20, 2001.

Decided July 3, 2001.

Patrick F. Philbin argued the cause for petitioners. With him on the briefs were John F. Wood, Ernest Thomas Sanchez, Susan M. Jenkins, Neal A. Jackson, Gregory A. Lewis, Michelle M. Shanahan, Mari-

lyn Mohrman–Gillis and Robert M. Winteringham.

Dennis J. Kelly, Lauren A. Colby and John G. Bentley were on the brief for intervenors Lay Catholic Broadcasting Network, Spring Arbor College and Cornerstone Community Radio, Inc.

Cheryl A. Leanza, Andrew Jay Schwartzman and Harold J. Feld were on the brief for amicus curiae National Federation of Community Broadcasters.

C. Grey Pash, Jr., Counsel, Federal Communications Commission, argued the cause for respondents. With him on the brief were Jane E. Mago, Acting General Counsel, Daniel M. Armstrong, Associate General Counsel, John M. Nannes, Acting Assistant Attorney General, U.S. Department of·Justice, Robert B. Nicholson and Christopher Sprigman, Attorneys. Christopher J. Wright, General Counsel, Federal Communications Commission, entered an appearance.

Before: GINSBURG, RANDOLPH and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge TATEL.

Concurring opinion filed by Circuit Judge RANDOLPH.

TATEL, Circuit Judge:

The Federal Communications Commission exempts noncommercial educational entities from participating in auctions for broadcast licenses when they apply for channels within the portion of the spectrum reserved for them, but not when they apply for channels in the unreserved spectrum. In this case, noncommercial educational broadcasters challenge the Commission's policy, arguing that the Balanced Budget Act of 1997 requires the Commission to exempt them from participating in auctions for any channel, reserved or unreserved, and that the Commission's adoption of this policy was arbitrary and capricious. Finding the Commission's refusal to exempt such broadcasters from auctions for unreserved channels contrary to the Act's plain language, we vacate the offending portions of the Commission's order.

I

For more than fifty years, the Federal Communications Commission has reserved part of the FM radio spectrum and several television channels exclusively for noncommercial educational use. *In re Applications of WQED Pittsburgh & Cornerstone Television, Inc.*, 15 FCC Rcd 202 ¶ 16 (1999), *vacated in part by* 15 FCC Rcd 2534 (2000). The Commission has done this because of the "high quality type of programming which would be available in such stations—programming of an entirely different character from that available on most commercial stations." *Id.* (internal quotations omitted). Not restricted to this spectrum, however, noncommercial educational broadcasters (NCEs) may also apply for licenses in the unreserved spectrum, known as "commercial" licenses.

Historically, the Commission allocated licenses for both reserved and unreserved channels through evidentiary hearings. Seeking to lessen reliance on these time-consuming hearings, Congress, acting through the Balanced Budget Act of 1997, amended Communications Act section 309(j)(1) to provide that if "mutually exclusive applications are accepted for any initial license or construction permit, then, except as provided in paragraph (2), the Commission shall grant the license or permit to a qualified applicant through a system of competitive bidding." Balanced Budget Act of 1997 § 3002(a)(1)(A), 47 U.S.C. § 309(j)(1). Section 309(j)(2) states that this competitive bidding authority "shall not apply to licenses or construction

permits issued by the Commission" for, among other things, NCEs. 47 U.S.C. § 309(j)(2)(C) (cross-referencing *id.* § 397(6)).

In an effort to implement the Balanced Budget Act, the Commission proposed holding auctions for all licenses for commercial channels, but not for channels reserved for NCEs. *In re Implementation of Section 309(j) of the Communications Act—Competitive Bidding for Commercial Broad. & Instructional Television Fixed Serv. Licenses,* 12 FCC Rcd 22363 ¶ 50 (proposed Nov. 26, 1997). The Commission would continue allocating the latter through evidentiary hearings. Although NCEs applying for licenses to operate stations on the part of the spectrum reserved for them would thus not have to participate in auctions, those applying for commercial licenses would. Because commenters disagreed about whether this approach was consistent with section 309(j)(2), and because the Commission "did not focus on the complicated nature of this issue in [its] *Notice* in this proceeding," the Commission solicited a further round of comment. *In re Implementation of Section 309(j) of the Communications Act—Competitive Bidding for Commercial Broad. & Instructional Television Fixed Serv. Licenses,* 13 FCC Rcd 15920 ¶ 25 (1998). In doing so, the Commission recognized that if section 309(j)(2) barred it from requiring NCEs to participate in auctions for commercial licenses, several alternatives existed: establishing a special track for processing NCE applications; adopting a hybrid approach when NCEs apply (for instance, evaluating applicants initially on a point system and, if the NCE is thereby eliminated, proceeding to an auction); or even making NCEs ineligible to apply for commercial licenses altogether. *In re Reexamination of the Comparative Standards for Noncommercial Educ. Ap-*

*plicants,* 13 FCC Rcd 21167 ¶¶ 39–44 (1998).

In the resulting Report and Order challenged here, the Commission answered what it called "[p]erhaps the most difficult question posed in this proceeding"—how to interpret section 309(j)(2)—by adopting its initial proposal and exempting NCEs from competing in auctions only when they apply for licenses to operate channels in the reserved spectrum. *See In re Reexamination of the Comparative Standards for Noncommercial Educ. Applicants,* 15 FCC Rcd 7386 ¶ 101 (2000); *see also id.* at ¶¶ 101–111. Petitioners—National Public Radio, the Association of America's Public Television Stations, the Corporation for Public Broadcasting, and the State of Oregon (acting on behalf of Southern Oregon University)—seek review of this decision, arguing that it conflicts with the 1997 Act's NCE exemption and that it is arbitrary and capricious.

## II

In evaluating petitioners' argument that the Commission's action violates the Balanced Budget Act of 1997, we proceed under the familiar two-part test of *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). If "Congress has directly spoken to the precise question at issue ... that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S.Ct. 2778. Only if the statute is silent or ambiguous do we defer to the agency's interpretation, asking "whether [it] is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. 2778.

Arguing that the Commission's action fails step one, petitioners claim that the Act unambiguously forbids the Com-

mission from requiring NCEs to participate in auctions to obtain licenses for any channel, reserved or unreserved. We agree. While section 309(j)'s first paragraph directs the Commission to award licenses through a system of competitive bidding, it only does so subject to limitations set forth in the second paragraph, one of which expressly denies the Commission authority to hold auctions for "licenses ... issued ... for [NCEs]." 47 U.S.C. § 309(j)(2). Because this paragraph's denial of authority is based on the nature of the station that ultimately receives the license, not on the part of the spectrum in which the station operates, nothing in the Act authorizes the Commission to hold auctions for licenses issued to NCEs to operate in the unreserved spectrum.

This is not to say that the Act's language is perfectly crafted. For instance, because the exemption refers to the ultimate recipient of the license, not to applicants for the license, the Commission apparently has authority to require an NCE applicant to participate in an auction so long as it does not ultimately receive a license. But as petitioners noted at oral argument, to ensure that an NCE never has to participate in an auction for a license that it ultimately receives, the Commission must exempt all NCE applicants from such auctions. Inartful drafting is not the same as ambiguity. *Cf. Meredith v. Fed. Mine Safety & Health Review Comm.*, 177 F.3d 1042, 1053 (D.C.Cir.1999) ("[T]he presence of a difficult question of statutory construction does not necessarily render that provision ambiguous for purposes of *Chevron*."). Here, the fact remains that under the Act's plain language the Commission must exempt NCEs from participating in all auctions. In any event, the Commission has not argued that the statute is ambiguous for this reason.

■ Our concurring colleague, advancing another argument not made by the Commission, believes that the statute is ambiguous for a different reason: the word "issued" in section 309(j)(2) may mean that the section applies only to licenses already issued, that is, to renewals of existing licenses. But this is not a plausible reading of the statute: section 309(j)(1)'s grant of bidding authority for licenses is expressly limited to "initial licenses," not to renewals. 47 U.S.C. § 309(j)(1). Reading 309(j)(2) as exempting only NCE renewals from this authority would thus render the section meaningless.

The Commission argues not that the statute is ambiguous for any of these reasons, but rather that it is silent on the specific question before us, thus requiring us to defer to the Commission's interpretation under *Chevron* step two. "[N]othing in the text of the provision," the Commission argues, "evinces unambiguous Congressional intent on the narrow question of competing applications filed by [NCEs] for a non-reserved channel." Respondent's Br. at 16; *see also In re Reexamination of the Comparative Standards for Noncommercial Educ. Applicants,* 15 FCC Rcd ¶ 106. By failing to distinguish between reserved and unreserved channels, however, section 309(j)(2) exempts NCEs that apply for commercial licenses from participating in auctions. True, nothing in the Act's text specifically says that NCEs applying for commercial licences are exempt from auctions. But general rules need not list everything they cover: no one would argue, for instance, that the statutory requirement that the Commission award licenses to serve "public convenience, interest, or necessity" does not apply to licenses for AM stations because the Act does not expressly mention AM licenses. 47 U.S.C. § 307(a). For the same reason, section 309(j)(2)'s NCE exemption from all auctions means

that NCEs are exempt from auctions for commercial as well as reserved licenses.

■ Because statutory language represents the clearest indication of Congressional intent, *cf. Qi–Zhuo v. Meissner,* 70 F.3d 136, 140 (D.C.Cir.1995) ("Where ... the plain language of the statute is clear, the court generally will not inquire further into its meaning."), and because the Act's general language covers all auctions, we must presume that Congress meant precisely what it said. Extremely strong, this presumption is rebuttable only in the "rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." *United States v. Ron Pair Enterp., Inc.,* 489 U.S. 235, 242, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (internal quotation omitted). The Commission's burden in rebutting the presumption created by clear language is onerous: the Commission must "show either that, as a matter of historical fact, Congress did not mean what it appears to have said, or that, as a matter of logic and statutory structure, it almost surely could not have meant it." *Engine Mfrs. Ass'n v. EPA,* 88 F.3d 1075, 1089 (D.C.Cir.1996); *see also Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 571, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982) (courts may ignore plain language in a narrow category of cases where "the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters."). The Commission here has fallen short of this high standard.

■ The Commission claims that section 309(j)(2) conflicts with another section of the Act—section 309(j)(1). *Cf. Engine Mfrs.,* 88 F.3d at 1089 ("The [agency's] strongest arguments arise from an apparent tension between two aspects of the authorization regime."). According to the Commission, the latter directs it to award licenses through competitive bidding, while the former prohibits it from doing so. But we do not understand how a general rule (section 309(j)(1)) can conflict with its own exception (section 309(j)(2)). Nor do we agree with the Commission that following section 309(j)(2)'s plain language would frustrate the Act's purposes. *Cf. Envtl. Def. Fund, Inc. v. EPA,* 82 F.3d 451, 469 (D.C.Cir.1996) ("Because [a] literal reading of the statute would actually frustrate the congressional intent supporting it, we look to the [agency] for an interpretation of the statute more true to the Congress's purpose."). According to the Commission, exempting NCEs from auctions for commercial licenses would undermine Congress's desire to "recover[ ] ... a portion of the value of the [commercial] spectrum" through auctions. 47 U.S.C. § 309(j)(3)(C). But because the Commission would be required to use auctions when NCEs have not applied, following the plain language of section 309(j)(2) would still increase the amount of money the Commission recovers. Most important, notwithstanding Congress's desire to increase revenue, it expressly exempted NCEs from participating in auctions, thus demonstrating that it understood that pursuit of this goal would be limited by the NCE exemption. "Deciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice—and it frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be the law." *Rodriguez v. United States,* 480 U.S. 522, 526, 107 S.Ct. 1391, 94 L.Ed.2d 533 (1987).

■ Nor, finally, do we find anything in the legislative history to support the Commission's interpretation of the statute. In fact, what little relevant legislative history exists reinforces section 309(j)(2)'s plain language. The original House and Senate

bills expressly limited the auction exemption to applications for "channels reserved for noncommercial use."S. 947, 105th Cong. § 3001(a)(1) (1997); H.R.2015, 105th Cong. § 3301(a)(1) (1997). The House–Senate conference abandoned this restriction, adopting the exemption as it now stands. H.R. CONF. REP. No. 105–217, at 9 (1997). As petitioners point out, "[w]here Congress includes limiting language in an earlier version of a bill but deletes it prior to enactment, it may be presumed that the limitation was not intended." *Russello v. United States*, 464 U.S. 16, 23–24, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983). The Commission offers an alternative explanation for the deletion: the restriction was originally used as part of an attempt to define "NCE" and was removed when the conference substituted a reference to the proper statutory definition. We need not resolve this debate, for even if the Commission's account is correct, the legislative history falls far short of demonstrating that "Congress did not mean what it appears to have said." *Engine Mfrs.*, 88 F.3d at 1089. We thus have no reason to believe that Congress meant anything other than that the Commission may not require NCEs to participate in auctions, regardless of the type of license they seek.

### III

Because the Commission's order conflicts with Communications Act section 309(j)(2), we have no need to consider petitioners' arbitrary and capricious challenge. The petition for review is granted and the portions of the Commission's Report and Order requiring NCEs that apply for licenses on the unreserved spectrum to participate in competitive auctions are vacated.

*So ordered.*

RANDOLPH, Circuit Judge, concurring:

One of the interesting features of a circle is that if you start traveling in one direction along its rim you will eventually wind up exactly where you began. The majority opinion starts by declaring the language of statute "plain." Maj. op. at 227, 229. Why is it "plain"? Because it is "presumed" that Congress meant what it said. *Id.* at 230. What did Congress say? Whatever the language of the statute makes plain.

The opinion also observes, rather curiously, that although the statute has a plain meaning, it is not "perfectly crafted" and represents "inartful [inartistic?] drafting." Maj. op. at 229. Notice the argument assuming its conclusion. The statute is not perfectly crafted, indeed is grammatically incoherent, if and only if the majority's reading of it is correct, which of course is the issue. If the majority is mistaken, as I think it is, the language of the statute simply conveys what its authors intended. There is no flaw in its drafting.

Let us now examine the language of 47 U.S.C. § 309(j)(2)(C) in the context of the entire subsection:

**(j) Use of competitive bidding**

(1) General authority

If, consistent with the obligations described in paragraph (6)(E), mutually exclusive applications are accepted for any initial license or construction permit, then, except as provided in paragraph (2), the Commission shall grant the license or permit to a qualified applicant through a system of competitive bidding that meets the requirements of this subsection.

(2) Exemptions

The competitive bidding authority granted by this subsection shall not apply to licenses or construction permits issued by the Commission—

(A) for public safety radio services, including private internal radio services used by State and local governments and non-government entities and including emergency road services provided by not-for-profit organizations, that—

(i) are used to protect the safety of life, health, or property; and

(ii) are not made commercially available to the public;

(B) for initial licenses or construction permits for digital television service given to existing terrestrial broadcast licensees to replace their analog television service licenses; or

(C) for stations described in section 397(6) of this title.

Section 397(6) defines "noncommercial educational broadcast station" or, NCE.

Attention must be paid to the word "issued" in § 309(j)(2)—competitive bidding does not apply to "licenses or construction permits issued by the Commission" for NCEs. Now if we read this to mean what it says the exemption from competitive bidding for licenses would apply only to licenses already "issued." How can that make sense? One answer is that the auction exemption is limited to renewals of licenses issued to NCEs in the non-reserved spectrum. In other words, Congress intended that new licenses may be auctioned off even if an NCE is vying for the license, but the Commission should not refuse to renew "licenses [already] ... issued" to stations merely because NCEs cannot compete with commercial applicants in an auction.

What does the majority offer in response? That "issued" cannot possibly mean what it means, maj. op. at 229–30—an answer that refutes the majority's next point that "Congress meant precisely what it said." *Id.* at 230. I do not deny the

feasibility of the majority's interpretation of § 309(j)(2)(C) nor do I deny the possibility of the Commission (not the court) interpreting the statute in that manner, although it would be a bit of a stretch. But to claim that the majority's reading derives from the "plain meaning" of the provision crosses the boggle threshold.

We ought to just face up to the obvious—this subsection is a mess. The problem is not just with § 309(j)(2)(C). Look at § 309(j)(2)(B)—the "competitive bidding authority granted by this subsection shall not apply to licenses ... for initial licenses ... for digital television service...." 47 U.S.C. § 309(j)(2)(B). To what does "licenses for initial licenses" refer? When asked at oral argument the Commission was as baffled as we were.

The Commission, at least, did not fall into the trap of treating the statute as clear when it clearly is not. *See* maj. op. at 230–31; *In re Reexamination of the Comparative Standards for Noncommercial Educational Applicants,* 15 F.C.C.R. 7386 ¶ 106 (2000). The Commission relied instead on the idea that some conflict existed between the general rule embodied in § 309(j)(1), requiring auctions, and the exception in § 309(j)(2). I agree with the majority that this rationale cannot be sustained. *See* maj. op. at 230; *In re Reexamination of the Comparative Standards for Noncommercial Educational Applicants,* 15 F.C.C.R. 7386 ¶ 106 (2000). Section 306(j)(2) is an exception; an exception deviates from a general rule, it does not "conflict" with it. Because the Commission's explanation for its decision is erroneous, we must remand under *SEC v. Chenery,* 318 U.S. 80, 88, 95, 63 S.Ct. 454, 87 L.Ed. 626 (1943).

I therefore concur that the Commission's order must be set aside and the case remanded to the agency. I do not agree that on remand the Commission must

adopt the majority's interpretation of § 309(j)(2)(C).