BROWN, Circuit Judge,
concurring:
I join Parts I, II-A and II-B of the opinion. I write separately because I believe special factors foreclose plaintiffs from bringing a Bivens action and because I disagree that the term “person” limits the scope of the Religious Freedom Restoration Act (“RFRA”).
I
Under Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), a federal court can only fashion a damages action for constitutional violations where no “special factors counsel[] hesitation” in doing so. Chappell v. Wallace, 462 U.S. 296, 298, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983) (quoting Bivens, 403 U.S. at 396, 91 S.Ct. 1999). Those factors do not relate to “the merits of the particular remedy” being sought, but involve “the question of who should decide whether such a remedy should be provided.” Bush v. Lucas, 462 U.S. 367, 380, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983). In cases where these special factors exist, we do not reach the underlying merits of plaintiffs’ claims because we simply decline to usurp Congress’s authority to create damages actions. See Wilkie v. Robbins, — U.S. —, 127 S.Ct. 2588, 2608, 168 L.Ed.2d 389 (2007) (because Bivens does not give plaintiff a cause of action, “there is no reason to enquire further into the merits of [plaintiffs] claim or the asserted defense of qualified immunity”); Lucas, 462 U.S. at 390, 103 S.Ct. 2404; Sanchez-Espinoza v. Reagan, 770 F.2d 202, 208 (D.C.Cir.1985) (because special factors foreclose a Bivens action, “[w]e do not reach the question whether the protections of the Constitution extend to noncitizens abroad”). Unfortunately, the majority ignores this important separation-of-powers principle and focuses entirely on whether plaintiffs’ constitutional claims are meritorious. See maj. op. 663-67.[1]
While the Supreme Court has created Bivens remedies for traditional Fifth and Eighth Amendment claims, it has “consistently refused to extend Bivens liability to any new context or new category of defendants.” See Corr. Servs. Corp. v. Malesko, 534 U.S. 61, 68-69, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001) (emphasis added). For example, in United States v. Stanley, 483 U.S. 669, 107 S.Ct. 3054, 97 L.Ed.2d 550 (1987), the Court held that a former serviceman could not bring a Fifth Amendment claim against unknown federal officers for secretly giving him LSD. In *673 reaching this conclusion, it explained that Congress’s failure to provide adequate alternative remedies is “irrelevant” where “congressionally uninvited intrusion into military affairs by the judiciary is inappropriate.” Id. at 683,107 S.Ct. 3054.
Applying the special factors inquiry to this case is particularly straightforward because of this court’s decision in Sanchez-Espinoza. In that case, we refused to create a Bivens action for Nicaraguans who brought claims against U.S. government officials for supporting the Contras. As then-judge Scalia explained:
[T]he special needs of foreign affairs must stay our hand in the creation of damage remedies against military and foreign policy officials for allegedly unconstitutional treatment of foreign subjects causing injury abroad. The foreign affairs implications of suits such as this cannot be ignored — their ability to produce what the Supreme Court has called in another context “embarrassment of our government abroad ” through “multifarious pronouncements by various departments on one question” Baker v. Carr, 369 U.S. 186, 226, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). Whether or not the present litigation is motivated by considerations of geopolitics rather than personal harm, we think that as a general matter the danger of foreign citizens’ using the courts in situations such as this to obstruct the foreign policy of our government is sufficiently acute that we must leave to Congress the judgment whether a damage remedy should exist.
770 F.2d at 209 (emphasis added). The present case involves the method of detaining and interrogating alleged enemy combatants during a war — a matter with grave national security implications. Permitting damages suits by detainees may allow our enemies to “obstruct the foreign policy of our government.” Moreover, dealing with foreign relations is primarily delegated to the executive and legislative branches, see U.S. CONST, art. I, § 8, els. 11-16; id. art. II, § 2, and creating a damages action could produce “multifarious pronouncements by various departments.” Nor does our government’s unanimous condemnation of torture answer this concern, since where to draw that line is the subject of acrimonious debate between the executive and legislative branches. Treatment of detainees is inexorably linked to our effort to prevail in the terrorists’ war against us, including our ability to work with foreign governments in capturing and detaining known and potential terrorists. Judicial involvement in this delicate area could undermine these military and diplomatic efforts and lead to “embarrassment of our government abroad.” Accordingly, all of the special factors we identified in Sanchez-Espinoza apply to this case and plaintiffs cannot bring their claims under Bivens.
II
A
The majority holds plaintiffs cannot bring a RFRA claim because they are not “person[s]” within the meaning of that statute. Yet, “[a] fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning.” Perrin v. United States, 444 U.S. 37, 42, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979). RFRA does not define “person,” so we must look to the word’s ordinary meaning. There is little mystery that a “person” is “an individual human being ... as distinguished from an animal or a thing.” Webster’s New International DiCtionary 1686 (1981). Unlike the majority, I believe Congress “[did not] specifically intend[ ] to vest the term ‘per *674 sons’ with a definition ... at odds with its plain meaning.” Rasul v. Rumsfeld, 433 F.Supp.2d 58, 67 (D.D.C.2006).
The majority does not point to a single statute defining “person” so narrowly as to exclude nonresident aliens from its ambit, and nothing in RFRA’s history suggests Congress' focused on the term’s scope here. RFRA originally provided that “[government shall not substantially burden a person’s exercise of religion” unless such a burden is “the least restrictive means of furthering [a] compelling governmental interest.” 42 U.S.C. § 2000bb-l (1994) (emphasis added). It defined “exercise of religion” as “the exercise of religion under the First Amendment to the Constitution.” Id. § 2000bb-2(4) (emphasis added). The reference to the “First Amendment” made it clear that persons who did not have First Amendment rights were not protected by RFRA. Given this clear textual basis, the term “person” did no work as a limiting principle — “First Amendment” did the job.
In the Religious Land Use and Institutionalized Persons Act (“RLUIPA”) of 2000, Pub.L. No. 106-274, 114 Stat. 803, Congress amended RFRA’s definition of “exercise of religion” to cover “any exercise of religion, whether or not compelled by, or central to, a system of religious belief,” and removed the term “First Amendment.” See id. §§ 7(a), 8(7)(A), 114 Stat. 806, 807. This change was meant to “clarify[ ] issues that had generated litigation under RFRA” by providing that “[r] eligious exercise need not be compulsory or central to the claimant’s religious belief system.” H.R. Rep. No. 106-219, at 30 (1999); see also Adkins v. Raspar, 393 F.3d 559, 567-68 & n. 34 (5th Cir.2004) siting pre-RLUIPA cases requiring “the religious exercise burdened to be ‘central’ to the religion”). Congress wanted to expand RFRA’s protections to a broader range of religious practices, see Navajo Nation v. U.S. Forest Serv., 479 F.3d 1024, 1033 (9th Cir.2007); there is no indication it wanted to broaden the universe of persons protected by RFRA. However, by removing the term “First Amendment” from RFRA, Congress inadvertently deleted the textual hook precluding persons who did not have First Amendment rights from asserting RFRA claims.
The panel majority attempts to cure the problem created by Congress’s careless amendment by constricting the meaning of the term “person.” This boils down to a claim that, by removing the term “First Amendment” from RFRA’s definition of “exercise of religion,” Congress sub silen-tio changed RFRA’s definition of “person.” But this transforms statutory interpretation into a game of whack-a-mole: a deleted textual hook does not simply re-appear in another statutory term.
Finding no other support for its constricted definition of “person,” the majority turns to decisions interpreting constitutional provisions: Johnson v. Eisentrager, 339 U.S. 763, 70 S.Ct. 936, 94 L.Ed. 1255 (1950) (Fifth Amendment), and United States v. Verdugo-Urquidez, 494 U.S. 259, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990) (Fourth Amendment). Eisentrager rejected this circuit’s conclusion that the breadth of the term “person” in the Fifth Amendment expanded the coverage of the Due Process Clause beyond its traditional limits. Nevertheless, nowhere in its extensive discussion did the Court rely on the definition of “person.”[2] Its holding turned *675 on the conventional understanding of the Fifth Amendment, the “full text” of that Amendment, and the foreign policy complexities of allowing aliens to assert constitutional rights. Id. at 782-83, 70 S.Ct. 936.[3] Moreover, Eisentrager interpreted the Due Process Clause; RFRA implements the Free Exercise Clause. The term “person” does not appear in the Free Exercise Clause, see U.S. CONST, amend. I (“Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof .... ”), and thus the definition of “person” cannot be the reason aliens held abroad do not have free exercise rights, see Boumediene, 476 F.3d at 993 (implying Guantanamo detainees do not have First Amendment rights even though “[t]he First Amendment’s guarantees of freedom of speech and free exercise of religion do not mention individuals”).
Verdugo is even less helpful to the majority. Unlike Eisentrager, Verdugo did rely on a definitional analysis, explaining that the Fourth Amendment did not apply to nonresident aliens outside of our borders, in part, because “the people” referred to in the Amendment identifies a “class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community.” 494 U.S. at 265, 110 S.Ct. 1056 (emphasis added). While “the people” are merely a “class of persons,” the relevant inquiry for RFRA purposes is “who are ‘persons’?” The answer is obvious — “persons” are individual human beings, of whom the American people are just one class.
B
While the majority’s approach is untenable, the plaintiffs still do not prevail. RFRA’s proscription that “[gjovernment shall not substantially burden a person’s exercise of religion” and RLUIPA’s new definition of “exercise of religion” as “any exercise of religion, whether or not compelled by, or central to, a system of religious belief,” leave no textual basis for prohibiting suits brought by non-resident aliens held at Guantanamo, or foreign nationals who work for American officials on NATO military bases, or, arguably, ji-hadists our soldiers encounter on foreign battlefields.[4] Wfiiile “statutory language represents the clearest indication of Congressional intent,” we may go beyond the text in those “rare cases” where a party can show that “the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.” Nat’l Pub. Radio, Inc. v. FCC, 254 F.3d 226, 230 (D.C.Cir.2001) (internal quotation omitted).
The unusual drafting history of RFRA and RLUIPA make this one of those rare cases. RFRA originally only provided for suits for violation of First Amendment *676 rights, which did not include intrusions on the free exercise of those in plaintiffs’ position. See Cuban Am. Bar Ass’n, Inc. v. Christopher, 43 F.3d 1412, 1428 (11th Cir.1995). There is no doubt that RLUIPA’s drafters, in changing the definition of “exercise of religion,” wanted to broaden the scope of the kinds of practices protected by RFRA, not to increase the universe of individuals protected by RFRA. See H.R. Rep. No. 106-219, at 30; Adkins, 393 F.3d at 567-68 & n. 34; Navajo Nation, 479 F.3d at 1033. Literal application of RFRA would force us to hold Congress’s careless drafting inadvertently expanded the scope of RFRA plaintiffs. Such a result is “demonstrably at odds with the intentions of [RLUIPA’s] drafters.” See Nat’l Pub. Radio, 254 F.3d at 230.
Even if I believed RLUIPA expanded the scope of persons protected by RFRA, I would have no trouble concluding defendants are protected by qualified immunity.[5] There was strong reason for defendants to believe RFRA originally did not apply to plaintiffs. While RLUIPA changed RFRA, it was far from clearly established that this change expanded the class of persons protected by RFRA.
C
Accepting plaintiffs’ argument that RFRA imports the entire Free Exercise Clause edifice into the military detention context would revolutionize the treatment of captured combatants in a way Congress did not contemplate. Yet, the majority’s approach is not much better. It leaves us with the unfortunate and quite dubious distinction of being the only court to de-ciare those held at Guantanamo are not “person[s].” This is a most regrettable holding in a case where plaintiffs have alleged high-level U.S. government officials treated them as less than human.
In drafting RFRA, Congress was not focused on how to accommodate the important values of religious toleration in the military detention setting. If Congress had focused specifically on this challenge, it would undoubtably have struck a different balance: somewhere between making government officials’ pocketbooks available to every detainee not afforded the full panoply of free exercise rights and declaring those in our custody are not “persons.” It would not have created a RFRA-like damage remedy, but it likely would have prohibited, subject to appropriate exceptions, unnecessarily degrading acts of religious humiliation. It would have sought to deter such acts not by compensating the victims, but by punishing the perpetrators or through other administrative measures. See, e.g., Ronald W. Reagan National Defense Authorization Act for Fiscal Year 2005, Pub.L. No. 108-375, §§ 1091 to 1092, 118 Stat. 1811, 2068-71 (2004) (to be codified at 10 U.S.C. § 801 note) (creating an administrative regime to prevent unlawful treatment of detainees); Detainee Treatment Act of 2005, Pub.L. 109-148, § 1003(a), 119 Stat. 2739 (to be codified at 42 U.S.C. § 2000dd) (“No individual in the custody or under the physical control of the United States Government, regardless of nationality or physical location, shall be subject to cruel, inhuman, or degrading treatment or punishment.”). Judicial interpretation without text is at best a stopgap; at worst, a usurpation. In 2000, *677 when Congress amended RFRA, jihad was not a prominent part of our vocabulary and prolonged military detentions of alleged enemy combatants were not part of our consciousness. They are now. Congress should revisit RFRA with these circumstances in mind.

. Similarly, none of the other Fifth Amendment cases the majority cites rely on the definition of “person.” See Jifry v. FAA, 370 F.3d 1174, 1182-83 (D.C.Cir.2004) (not mentioning the term "person” in holding nonresident aliens with insufficient contacts do not have Fifth Amendment rights); People’s Mojahedin *675 Org. of Iran v. U.S. Dep't of State, 182 F.3d 17, 22 (D.C.Cir.1999) (same for foreign entities).

. In fact, the Eisentrager Court repeatedly used the term "person” in its common meaning. See id. at 768 n. 1, 70 S.Ct. 936 (citing cases brought on behalf of “persons,” referring to "German enemy aliens”); id. at 783, 70 S.Ct. 936 ("The Court of Appeals has cited no authority whatever for holding that the Fifth Amendment confers rights upon all persons. ...”).

. The term "government” provides no limiting basis since RFRA defines this term as including an "official (or other person acting under color of law) of the United States, or of a covered entity.” 42 U.S.C. § 2000bb-2(l). Defendants, the Secretary of Defense and high-ranking military officers, are unquestionably officials of the United States. Moreover, as the majority points out, since defendants are officials of the United States, it is irrelevant whether Guantanamo Bay Naval Base is a "covered entity.” Maj. op. 667 n. 19.

. There is some uncertainly about whether qualified immunity is available to federal officials sued under RFRA. See Kwai Fun Wong v. United States, 373 F.3d 952, 977 (9th Cir.2004) ("Neither this court nor any other court of appeals has decided whether qualified ini-munity is available to a federal government official sued under RFRA.’’). In this case, however, Plaintiffs have assumed that qualified immunity is available and have thus waived any argument to the contrary.