# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued September 9, 2015          Decided December 15, 2015

No. 14-5203

WATERVALE MARINE CO., LTD., AS OWNER OF THE M/V
AGIOS EMILIANOS, ET AL.,
APPELLANTS

MERCATOR LINES (SINGAPORE) PTE, LTD., AS OWNER OF THE
M/V GAURAV PREM, ET AL.,
APPELLEES

v.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY AND
UNITED STATES COAST GUARD,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:12-cv-00105)

*Barry M. Hartman* argued the cause for appellants. With him on the briefs was *Michael G. Chalos*.

*Anne Murphy*, Attorney, U.S. Department of Justice, argued the cause for appellees. With her on the brief were *Benjamin C. Mizer*, Acting Assistant Attorney General, *Ronald C. Machen Jr.,* U.S. Attorney at the time the brief was filed, and *Matthew M. Collette*, Attorney.

Before: GRIFFITH and SRINIVASAN, *Circuit Judges*, and SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* SILBERMAN.

Opinion concurring in part and concurring in the judgment filed by *Circuit Judge* GRIFFITH.

SILBERMAN, *Senior Circuit Judge:* This case presents the question whether the Secretary of the Department of Homeland Security – acting through the Coast Guard – may impose certain conditions (nonfinancial in nature) upon the release of ships suspected of violating the Act to Prevent Pollution from Ships.

Ship owners appeal from the district court's holding that the case is nonjusticiable. We disagree as to justiciability, but affirm on other grounds.

I.

The Act is a federal statute passed to implement various environmental obligations that the United States assumed when it entered into the International Convention for the Prevention of Pollution from Ships. *See* 33 U.S.C. § 1901(a)(4). The goal of the treaty and its implementing legislation is to eliminate the intentional pollution of the oceans by "oil and other harmful substances," as well as minimize "accidental discharge of such substances." *See Wilmina Shipping AS v. U.S. Dep't of Homeland Sec.*, 934 F.Supp.2d 1, 6 (D.D.C. 2013) (citations omitted).

The Secretary of the Department of Homeland Security is authorized "to administer and enforce" the Convention and to

"prescribe any necessary or desired regulations to carry out" its requirements. 33 U.S.C. § 1903(a), (c)(1).[1] It is "unlawful to act in violation of the" Convention "or the regulations issued thereunder." 33 U.S.C. § 1907(a). Knowingly violating the law may give rise to both criminal and civil liability.

General authority to grant departure clearance to foreign-flagged ships is in Customs. *See* 46 U.S.C. § 60105(b). But a specific provision of the Act deals with the enforcement of the Convention:

> If any ship subject to the [Convention]…is liable for a fine or civil penalty under this section, or if reasonable cause exists to believe that the ship, its owner, operator, or person in charge may be subject to a fine or civil penalty under this section, the Secretary of the Treasury [now DHS], upon request of the Secretary [of DHS], shall refuse or revoke the clearance required by section 60105 of Title 46. Clearance may be granted upon the filing of a bond or other surety satisfactory to the Secretary [of DHS].

33 U.S.C. § 1908(e). Both references to the Secretary now refer to the Secretary of Homeland Security who supervises both Customs and the Coast Guard, but in accordance with regulations, Customs maintains authority to clear a vessel *unless* the Coast Guard requests otherwise, and it is the Coast Guard that has authority to accept a bond.

---

[1]The authority to grant clearance, originally vested in the Secretary of the Treasury, was subsequently transferred to the Secretary of Homeland Security, and then further delegated to Customs. *See* 68 Fed. Reg. 28323 (May 23, 2003).

Appellants own and operate two foreign-flagged vessels: the M/V AGIOS EMILIANOS and the M/V STELLAR WIND. Each periodically docks at U.S. ports, in the course of its oceangoing business, to load or offload cargo. In the spring of 2011, the Coast Guard began receiving whistleblower complaints asserting violations of the Act. Specifically, it was claimed that the appellants' vessels had falsified the oil record books required of all vessels when traveling over international waters and docking at U.S. ports. Upon initial investigation stemming from the complaints, the Coast Guard determined that it had reasonable cause to believe that the vessels' operators had committed violations of the Act. Therefore the Coast Guard ordered Customs to withhold departure clearance.[2] The vessels were held for investigation for differing lengths of time, ranging from a couple of days to over a month.

As the district court noted, the vessels were eventually released, but not until appellants had both posted a bond *and* executed a "Security Agreement." These agreements were required by the Coast Guard as a condition of release of the vessels. They were designed to allow the government to later prosecute its case if merited. As such, these agreements include several terms above and beyond the posting of a typical financial bond. They called for the vessel owners and operators to pay wages, housing, and transportation costs to crew members who remain in the jurisdiction, as well as facilitate their travel to court appearances, to encourage crew members to cooperate with the government's investigation, to help the government serve subpoenas on foreign crew members located outside of the United States, to waive objections to both *in personam* and *in rem* jurisdiction, and to enter an appearance in federal district court. After their release, the vessel owners initiated an

---

[2]The AGIOS EMILIANOS and STELLAR WIND were held at ports in Louisiana.

administrative appeal with the Coast Guard to challenge the validity of the Security Agreements.

Meanwhile, the Coast Guard proceeded with its criminal prosecutions. Ultimately, the management associated with the AGIOS EMILIANOS and STELLAR WIND pled guilty, and admitted to intentionally bypassing mandatory anti-pollution equipment on board and discharging oil waste directly into the waterways. Some among the crew on both ships had rerouted oily water around required water-oil separators and sludge incinerators, discharging it directly into the ocean. Those discharges were then hidden from the mandatory oil records book, and false entries that the environmental protection equipment was being used were made.

Appellants, having failed in all administrative appeals, challenge the nonfinancial Security Agreements that the Coast Guard demanded before granting departure clearance as beyond the Coast Guard's statutory authority. The district court ruled for the government, stating that the matter of conditional departure clearance was committed to the Coast Guard's discretion by law. The court did observe that the final sentence of § 1908(e), describing a "bond or other surety," might well be limited to purely financial terms. But the court was of the view that the language stating that "clearance may be granted upon the filing of a bond or other surety satisfactory to the Secretary" gave the Department (the Coast Guard) unreviewable discretion, and therefore the court had no standards by which to judge the claim.

6

II.

Appellants challenge the district court's holding on several grounds.  Of course, they insist that the case is reviewable; that there are judicially acceptable standards to apply.  Then, proceeding to the merits, appellants assert that only Customs – not the Coast Guard – has authority to withhold a ship's clearance.  And although the Coast Guard can require a bond (or other surety), it may not demand any nonfinancial conditions as part of the bond.[3]

The government reiterates its position before the district court; that we lack jurisdiction because the Coast Guard has unreviewable discretion to accept or reject a bond, and thereby prevent a ship's departure.  Moreover before us, for the first time, appellants' standing is challenged and it is further claimed that the cases are moot.  Turning to the surety, the government contends that the Coast Guard can insist on the nonfinancial conditions it imposed because such conditions are within the meaning of the terms "bond or other surety."  Indeed, it is argued that such conditions are commonly included in bonds. (The government's brief boldly so asserts, but no examples nor dictionary definitions are cited, which is a novel approach to brief writing.)

---

[3]Appellants claim that the Coast Guard could have used several other techniques to accomplish what it sought by way of the Security Agreements. *See* 18 U.S.C. § 3144 (authority to secure testimony of material witnesses); Fed. R. Crim. P. 15 (authority to take depositions of witnesses); 14 U.S.C. § 89(a) (warrantless search, seizure, and arrest authority);  Fed. R. Crim. P. 6 (grand jury powers); 28 U.S.C. § 1821; 28 C.F.R. Part 21 (authorizing and implementing procedures to pay transportation, lodging and other expenses to secure witness testimony).  But, they claim, such measures are not permissible under § 1908(e).

The government explains why the Coast Guard insisted on the nonfinancial conditions in these cases.  It asserts – and appellants agree – that the financial terms of a bond referred to in the Act cover the ultimate liability of a ship owner, which can be determined only after a legal proceeding, either civil or criminal.  In other words, nothing prevents  the ship, after posting the bond, from sailing away.  And if the government lacks sufficient evidence to present in court without the ship and its crew, the ship owner's liability disappears.

\* \* \*

We have little doubt as to our jurisdiction.  Appellants clearly have standing, and the case is not moot, even if the ships have sailed. The government contends that the agreements have no ongoing legal effect. Apparently this is because the plea agreements were reached by some appellants in the interim between the filing of the original complaint and this appeal. But the government overlooks that two of the appellants never pled to, nor were they, as yet, charged with a crime.  It also ignores the fact that Security Agreements with two of the parties have no expiration date at all, and even for those Security Agreements with a duration provision, language releasing the parties has not been clearly triggered.  Finally, the government disregards the point that even the criminal pleas that were reached do not foreclose the government's ability to seek further civil penalties, as allowed under the Act.

Nor do we agree with the government and the district court that the Coast Guard's discretion is unreviewable.  Although the Coast Guard may have wide discretion as to the *amount* of the bond it requires (we doubt that even that is totally unreviewable) there is no reason to believe that the legal question presented – whether the Coast Guard can impose nonfinancial conditions – is not suitable for judicial review.

On the other hand, appellants' lengthy discussion of the respective roles of the Coast Guard and Customs seems rather academic. After all, both entities are in the same Department under the common supervision of the Secretary of Homeland Security. In any event, it is clearly the Coast Guard under the Secretary's regulations that has the authority granted by the Secretary to "request" that Customs "refuse" clearance.[4]

Which brings us to the main issue in the case; whether the Coast Guard may require the nonfinancial conditions. Appellants point to the legislative history indicating that Congress intended a bond or other surety to cover *only* financial liability for penalties imposed in civil or criminal proceedings. *See* H.R. No. 96-1224, *reprinted in* 1980 U.S.C.C.A.N. 4849. The government does not contest the House Report on which appellant relies, instead focusing on the phrase "satisfactory to the Secretary" as giving the Coast Guard broader authority. We find it unnecessary to decide the scope of the term "bond or other surety" because the first sentence of section 1908(e) gives the Coast Guard the requisite authority. It states that "[i]f any ship subject to the [Convention]…is liable for a fine or civil penalty...or if reasonable cause exists to believe that the ship...may be subject to a fine or civil penalty [Customs]...upon request of the Secretary [the Coast Guard]...shall refuse...clearance," and as such it clearly provides authority in the Coast Guard to simply hold the ship in port until legal proceedings are completed.[5]

---

[4]*See* 19 C.F.R. §§ 4.60a, 4.66a, 4.66c(a).

[5]Our concurring colleague suggests that we are bypassing the text and resorting to our own reasoning. We concede we are reasoning, but we are focusing on the meaning and necessary implication of the first sentence of section 1908(e), which of course is textual analysis. The concurrence does not directly dispute that in the absence of the second

The nonfinancial conditions can, therefore, be thought of as simply the *quid pro quo* for allowing ships to depart. It is not necessary to consider whether those conditions are legitimately a part of "a bond or other surety" because they could be required independently of a bond. Although the Act *authorizes* the Secretary (Coast Guard) to request clearance of a ship if a bond is satisfactory, the Coast Guard is not required to accept a bond. (Here we agree with the district court that the words "may" and "satisfactory" are significant.) Indeed, as we understand the government, a financial bond, given its limited use, is ordinarily not satisfactory, so the Coast Guard need not accept bonds without accompanying nonfinancial conditions.

We note that another statutory section provides a ship owner with a cause of action for the government's unreasonable delay in granting departure clearance.[6] We need not consider whether the reasonableness of nonfinancial conditions is also subject to challenge because in the cases before us appellants have not asserted that the nonfinancial conditions are unreasonable.

Accordingly, we must assume that holding the ships and crew until a civil or criminal proceeding was completed was reasonable. And since the Coast Guard can hold the ship for

---

sentence of 1908(e), the first sentence would give the Coast Guard the requisite authority for the Security Agreements.

Nor do we understand why our own interpretation gives the Coast Guard any more authority than does our colleague's interpretation. After all, the concurrence contends that a "bond or other surety" can include *any* nonfinancial condition – lasting presumably indefinitely – so long as it is secured by a pot of money and labeled a bond.

[6]*See* 33 U.S.C. § 1904(h).

such a purpose, it seems to follow that the Coast Guard can agree to notify Customs to release the ship only upon condition that a civil or criminal proceeding would not be jeopardized.

* * *

For the above reasons, we affirm the district court's judgment.

*So ordered.*

GRIFFITH, *Circuit Judge*, concurring in part and concurring in the judgment:

The majority is correct that section 1908(e) authorizes the Coast Guard to accept a *quid* in return for the *quo* of releasing the ship. That *quid* is a "bond or other surety." 33 U.S.C. § 1908(e). Rather than find that the Security Agreements in this case qualify as a "bond or other surety," however, the majority bypasses the text of the statute and resorts to its own reasoning: the greater power granted by the statute to hold the ship must surely include the lesser power to condition its release. And as a matter of logic, that seems right. However, nothing in the text expressly authorizes such a broad, free-floating *quid pro quo* authority. Unlike the majority, I would not decide whether such authority exists by implication. Instead, I would affirm the judgment of the district court on the narrower ground provided by the text of the statute: a "bond or other surety"—the *quid* provided by Congress—includes the Security Agreements in this case.

As the majority recognizes, Congress has given the Coast Guard wide discretion in setting the conditions of a bond or other surety. My point is only that such discretion comes from an explicit statutory grant allowing the Coast Guard to accept a "bond or other surety." Apart from that authority, nothing in the express language of the statute permits a *quid pro quo* exchange and ignoring the phrase "bond or other surety" renders that provision superfluous.

Once a ship's clearance has been refused or revoked, the statute authorizes the granting of clearance "upon the filing of a bond or other surety satisfactory to the Secretary." 33 U.S.C. § 1908(e). Because the phrase "bond or other surety" is not qualified or defined, the phrase must be given its "ordinary meaning," *Taniguchi v. Kan Pac. Saipan, Ltd.*, 132 S. Ct. 1997, 2002 (2012), which includes both financial and

non-financial conditions. A bond, for example, is simply a "written promise to pay money *or do some act* if certain circumstances occur or a certain time elapses." BLACK'S LAW DICTIONARY (10th ed. 2014) (emphasis added); *see also* MERRIAM-WEBSTER UNABRIDGED DICTIONARY (online ed. 2015) (defining "bond" as "a usually formal written agreement by which a person undertakes to perform *a certain act* (such as to appear in court or fulfill the obligations of a contract) or abstain from performing *an act* (such as committing a crime) with the condition that failure to perform or abstain will obligate the person . . . to pay a sum of money" (emphasis added)). A surety is similarly broad: a "formal assurance," especially "a pledge, bond, guarantee, or security given for the fulfillment of an undertaking." BLACK'S LAW DICTIONARY (10th ed. 2014); *see also* MERRIAM-WEBSTER UNABRIDGED DICTIONARY (online ed. 2015) (defining "surety" as "a pledge or other formal engagement given for the fulfillment of an undertaking").

These definitions demonstrate that both bonds and sureties are general contractual devices used to assure performance of some act. The text of the statute nowhere limits these ordinary meanings to financial conditions alone.

The cardinal rule of statutory construction—that the legislature says in a statute what it means and means what it says—cautions against overlooking the text and relying instead on what a court might think is an unstated principle that informs the provision. *See Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992). Reading the statute for what it says, the Security Agreements comfortably fit within the authorization to demand a "bond or other surety" in exchange for the release of the ship. Each Agreement requires the ship owner to post a "Surety Bond" to "ensure performance of

th[e] Agreement" and the payment of any fines or penalties. To perform the Agreement, the ship owner must waive objections to jurisdiction and assist in the investigation, for example by paying for lodging and meals for the crew to remain in the United States. The United States may keep the bond amount not only if it secures a judgment against the owner, but also if the owner "fail[s] to waive objections to jurisdiction as required by this Agreement." And it may keep a certain portion of the bond amount if the ship owner materially breaches the Agreement's other conditions. Thus, as with any bond or surety, the Agreements bind the ship owners "to perform [ ] certain act[s]"—waive objections to jurisdiction and assist in the investigation—"with the condition that failure to perform . . . will obligate the [ship owners] . . . to pay a sum of money." MERRIAM-WEBSTER UNABRIDGED DICTIONARY (online ed. 2015) (defining "bond").

The appellants challenge this reading of the statute, arguing that a phrase in the legislative history shows the Coast Guard lacks the power to impose non-financial conditions for the release of a ship:

> *To assure payment of any fine or civil penalties* that might be incurred upon completion of criminal proceedings or civil penalty actions, the Secretary of the Treasury is required to refuse or revoke clearance to any ship upon request of the Secretary of Transportation. However, clearance may be granted upon the filing of a bond or other satisfactory surety.

H.R. Rep. No. 96-1224, at 17 (1980), *reprinted in* 1980 U.S.C.C.A.N. 4849, 4864 (emphasis added). According to the appellants, "[t]o assure payment of any fine or civil penalties"

means that the bond or surety must be limited to covering the payment of a fine. Leaving to one side the debate about the value of legislative history in statutory interpretation, *see Samantar v. Yousuf*, 560 U.S. 305, 326-27 (2010) (Scalia, J., concurring in the judgment), we have consistently held that where the statutory text is clear, "[t]he plain meaning of legislation should be conclusive" unless it "compels an odd result." *Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1088 (D.C. Cir. 1996) (internal quotation marks omitted); *Nat'l Pub. Radio, Inc. v. FCC*, 254 F.3d 226, 231 (D.C. Cir. 2001). Here, nothing odd results from imposing conditions that assist the United States in its prosecution of violations of the Act to Prevent Pollution from Ships. We would be stepping beyond the bounds of the judicial role were we to disregard the text of the statute based on a phrase in a House Report.

In any event, the appellants make too much of this phrase. The language from the House Report upon which the appellants rely does not limit a bond or other surety to financial conditions. Instead, it offers that one purpose of section 1908(e) is to make sure that fines are paid. But any likelihood of obtaining a fine vanishes if the United States cannot secure the conditions included in the Security Agreements here. For instance, if ship owners do not waive objections to jurisdiction, the United States may lack jurisdiction to prosecute them after granting clearance. No prosecution means no fine, in which case the United States must return the bond amount to the ship owners. Recognizing this problem, the appellants conceded at oral argument that a "bond or other surety" could, at a minimum, contain an obligation to waive objections to jurisdiction. Appellants then suggested a new line between non-financial conditions that are jurisdictional and those that are not. But that line, like the

distinction the appellants urge between financial and other conditions, has no basis in the text of the statute.

For these reasons, I would affirm the judgment of the district court on the ground that the Security Agreements are the type of "bond or other surety" that the statute's plain text authorizes the Coast Guard to accept in exchange for the release of the ship.